UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 09-cv-61840 Seitz/O'Sullivan

FEDERAL TRADE COMMISSION,

      Plaintiff,

   v.

1st GUARANTY MORTGAGE CORP., *et al.,*

      Defendants.

## ORDER

**THIS MATTER** comes before the Court on the Plaintiff's Motion for Summary Judgment against Defendants**,** Stephen Lalonde, Amy Lalonde, and Michael Petroski (DE# 113-1, 8/26/10). On November 17, 2009, Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), commenced this action by filing a Complaint pursuant to Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, Section 410(b) of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679h(b), and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108. The Complaint alleges that Defendants Stephen Lalonde, Amy Lalonde, Michael Petroski, 1st Guaranty Mortgage Corp., Spectrum Title, Inc., Crossland Credit Consulting Corp., and Scoreleaper, LLC, ("Defendants") engaged in unfair or deceptive acts or practices in connection with the sale and offering for sale, of mortgages, credit repair services, and loan modification

1

services, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the CROA, 15 U.S.C. §§ 1679-1679j, and the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

The Court has considered the following: the Complaint, Plaintiff's Motion for Summary Judgment (DE# 113, 8/26/10), the Memorandum in support thereof (DE# 113-1), Plaintiff's Statement of Uncontroverted Material Facts (hereinafter "SOUF") (DE# 113-2), Plaintiff's Summary Judgment Exhibits (1-35) (DE# 113-3 through 113-9) , Defendant, Amy Lalonde's, Statement to Controverted Material Facts and exhibits thereto (DE# 119, 9/10/10), Defendant, Amy Lalonde's, Opposition to Motion for Final Summary Judgment (DE# 120, 9/10/10), Petroski's Motion In Opposition for Final Summary Judgment and Injunction (DE# 151, 11/30/10), Memorandum In Support of Defendant Stephen Lalondes [sic] Opposition to Plaintiff's Request for Summary Judgment (DE# 156, 12/28/10), S. Lalonde's Exhibits (referred to as "DSLMSJ") (DE# 158, 12/28/10), Defendant Stephen Lalonde's ... Statement of Controverted Material Facts (DE# 159, 12/29/10), additional Exhibits (DE# 160, 12/29/10), and the FTC's replies to the defendants' opposition (A. Lalonde DE#127, 9/27/10; M. Petroski DE# 152, 12/14/10; S. Lalonde DE# 168, 1/11/10).  Neither S. Lalonde nor Petroski filed their own declarations or affidavits in support of their respective opposition to the FTC's motion for summary judgment.   The undersigned is granting the FTC's motions to strike Petroski and Lalonde's sur-replies as well as Lalonde's supplemental filing (DE# 198, 3/21/11) that were filed without leave of court. The undersigned is denying Defendant Stephen Lalonde[']s Request for Leave to File Responses to Plaintiff's Reply for Opposition of Summary Judgment. (DE# 185, 2/1/11).  The undersigned did not consider Petroski's or Lalonde's sur-replies or Lalonde's supplemental filing.  Genuine issues of fact exist as to Amy Lalonde's individual liability

2

regarding her knowledge of the deceptive acts. The Court denies the Motion for Summary Judgment against her. Because there are no genuine issues of material fact as to Stephen Lalonde and Michael Petroski, the Court hereby grants Plaintiff's Motion for Summary Judgment as to them individually (DE# 113, 8/26/10). The Court will enter separate Final Judgments and Orders of Permanent Injunction against Stephen Lalonde and Michael Petroski..

## INTRODUCTION

The FTC alleges that individual defendants Stephen Lalonde ("S. Lalonde" or "Lalonde"), Amy Lalonde ("A. Lalonde" or "Ms. Lalonde"), and Michael Petroski ("Petroski") each played an integral role in one or more of three scams that defrauded consumers seeking credit and/or mortgage assistance. The consumer injury resulting from the three scams totaled at least $2.7 million.

Lalonde directed or co-managed all three frauds. In the first, for which he is now serving a five-year prison sentence, Lalonde utilized corporate Defendants, Spectrum Title, Inc. ("Spectrum") and 1st Guaranty Mortgage, Inc. ("1st Guaranty"), to steal consumers' refinanced mortgage monies. In the second, Lalonde and his manager Petroski utilized corporate Defendants, 1st Guaranty, Crossland Credit Consulting, Inc. ("Crossland"), and, later, Scoreleaper, Inc. ("Scoreleaper"), to misrepresent that they would improve consumers' credit scores and then obtain mortgages for them. In the third scam, again utilizing 1st Guaranty, Crossland, and Scoreleaper, Lalonde and Petroski misrepresented Defendants' prowess in obtaining loan modifications.

There is no genuine issue of material fact as to the individual liability of S.Lalonde and Petroski. However, genuine issues of material fact exist regarding A. Lalonde's individual

liability.  The Federal Trade Commission is therefore entitled to summary judgment against S. Lalonde and Petroski as a matter of law, but not as to A. Lalonde.  *Batey v. Stone*, 24 F.3d 1330, 1333 (11th Cir. 1994).[1]

## I.    FACTUAL FINDINGS

### A.    The Defendants

**Corporate Defendant 1st Guaranty**, a Florida corporation incorporated in 2001 and dissolved in September 2009, held itself out, in Internet advertising and oral representations to consumers, as a mortgage broker which could assist consumers in obtaining new loans for consumers, as well as  refinancing and modifying existing loans.[2]  1st Guaranty and each of the other three corporate defendants operated from the same business address.[3]

**Corporate Defendant Spectrum,** a Florida corporation incorporated in 2005 and dissolved in September 2008, was the title and settlement agent for 1st Guaranty brokered loans.[4] As described in § II.B, *infra*, Spectrum represented that loan proceeds would be disbursed in a certain way, and then failed to do so.

---

[1]  Plaintiff's summary judgment motion applies only to the three individual Defendants.   The Court has already entered a default with respect to the four corporate Defendants – 1st Guaranty Mortgage, Inc., Crossland Credit Consulting, Inc., Spectrum Title, Inc., and Scoreleaper, Inc. DE 56 (Clerk's Default, Feb, 4, 2010).  Plaintiff has moved separately for entry of a default judgment against these four corporate defendants.

[2]  Plaintiff's Statement of Uncontroverted Material Facts (hereinafter referred to as "SOUF"). (DE# 113-2, 8/26/10).  SOUF, ¶ 2.

[3]  Until July 2009 the companies, including Amy Lalonde's company, Spectrum, operated from 5100 N. Dixie Highway, Ft. Lauderdale, FL 33334. Thereafter, until service of the complaint and temporary restraining order in this case on November 19, 2009, they operated from 3101 N. Federal Highway, Oakland Park, FL 33306.  SOUF, ¶  41.

[4]  SOUF, ¶ 3.

**Corporate Defendants Crossland** and, later, **Scoreleaper,** sold purported credit repair and loan modification services to consumers.[5]  Crossland was incorporated in Florida in June 2008 and dissolved in September 2009;[6] Scoreleaper was incorporated in Florida in May 2009.[7] Shortly after beginning its operations, Scoreleaper – using either its own name or an alter ego, "Delta Partners" – assumed the functions of 1st Guaranty.[8]

On February 4, 2010, the Clerk of Court entered a Default against the corporate defendants, 1st Guaranty, Spectrum, Crossland Credit, and Scoreleaper, in this action. (DE# 56) The FTC's motion for summary judgment addresses the individual liability of the defendants. The FTC filed a separate motion for default judgment against the corporate defendants, which remains pending.

**Individual Defendant S. Lalonde** owned and controlled 1st Guaranty, Crossland, and Scoreleaper,[9] and assisted in the management of Spectrum.[10]  In addition, he was the principal of at least 22 other entities, the majority of which operated from the same business address as the four corporate Defendants.[11]  Lalonde monitored his businesses from an office on his business

---

[5]  SOUF ¶ 5.

[6]  SOUF, ¶ 4.

[7]  SOUF, ¶ 5.

[8]  *Id*.

[9]  SOUF, ¶ 6.

[10]  SOUF, ¶ 7.

[11]  SOUF, ¶ 34, citing DE 9, p. 5 (Exhibits in Support of Plaintiff's Motion for *Ex Parte* Temporary Restraining Order, Preliminary Injunction, and Other Equitable Relief ("TRO Exhibits") Vol. II, Ex. 15 (Declaration of Ronald Lewis ("Lewis TRO Decl.")), ¶ 4 and Att. A).  As the Receiver has discussed, there has been substantial asset commingling between the corporate Defendants and these

premises.[12]  His monitoring included use of audio and video equipment, which he utilized,

among other things, to listen in on and record calls of his sales personnel.[13]  Lalonde is currently

serving a five-year prison sentence in connection with the theft of mortgage proceeds executed

through Spectrum.[14]

     **Individual Defendant A. Lalonde** was Spectrum's President,[15] as well as the signatory

on its bank accounts, including the escrow account from which Spectrum failed to disburse

consumers' refinanced mortgage monies.[16]  Ms. Lalonde represented Spectrum in its dealings

with third parties, such as its title insurance underwriter, and performed a number of important

duties related to its day-to-day business functions.[17]  She also assisted her husband, S. Lalonde,

---

other Lalonde entities.  DE 40 (Receiver's Motion to Expand Scope of Receivership), pp. 4-6;  PSJ
Ex. 32 (Declaration of Mark Raymond ("Receiver Decl.")), ¶ 7.  Moreover, in his asset deposition,
Lalonde stated that his companies made at least $600,000 - $700,000 in paperless loans to one
another.  SOUF, ¶¶ 36-37, citing PSJ Ex. 35f, S. Lalonde Dep. 42:5-42:8, 44:13-46:8,  Dec. 9,
2009.

There are two other Ronald Lewis Declarations cited in this memorandum in addition to the TRO
Declaration.  These are PSJ Ex. 33 (Supplemental Declaration of Ronald Lewis in support of Motion
for an Order Deeming Service on Defendant Michael Petroski Complete and Requiring Him to Show
Cause Why a Preliminary Injunction Should Not be Issued Against Him ("Supp. Lewis Decl.")),
April 5, 2010; PSJ Ex. 34 (Second Supplemental Declaration of Ronald Lewis [in Support of
Plaintiff's Summary Judgment Motion] ("Lewis SJ Decl.")), Aug. 18, 2010.

[12]   SOUF, ¶¶ 8, 42.

[13]   SOUF, ¶¶ 8, 42, 46.

[14]   SOUF, ¶ 73.

[15]   SOUF, ¶ 10.

[16]   SOUF, ¶¶ 11, 13.

[17]   SOUF, ¶ 15-19.

as the bookkeeper and paymaster of Crossland and Scoreleaper.[18]  Throughout the time she

worked for her company, Spectrum, and the various companies connected to her husband, Ms.

Lalonde maintained and regularly occupied a business office at the companies' corporate

headquarters.[19]

**Individual Defendant Petroski,** using his name or the names, Mike or Mark Marshall,

managed and actively participated in the deceptive practices of Crossland and Scoreleaper.[20]

Although Petroski terminated his employment with the two companies in September 2009, he

continued to deceive consumers on his own, evading service in this case, and misrepresenting

credit repair and mortgage services until at least April 2010 –  four-and-a-half months after the

filing of this case.[21]

### B.   Defendants' Business Operation

The defendants' first scam – the naked theft of monies from consumers – began in at least

February 2007 and was perpetrated by S. Lalonde and allegedly A. Lalonde.[22]  The two

subsequent scams – a bogus credit repair operation and a fraudulent loan modification business –

each involving S. Lalonde and Petroski – followed the collapse of the first scam.[23]

---

[18]   SOUF, ¶¶ 20-21.

[19]   SOUF, ¶ 18.

[20]   SOUF, ¶¶ 26-27, 30-31, 96.

[21]   SOUF, ¶¶ 32-33.

[22]   SOUF, ¶ 50.

[23]   SOUF, ¶¶ 92, 96.

**1.   Defendants' Deceptive Practices Involving the Failure To Fully and Promptly Disburse New Mortgage Monies Pursuant to Earlier Representations Made to Consumers**

In early 2006, Spectrum began serving as the title and settlement agent for 1st Guaranty brokered loans.[24]  Ms. Lalonde was the sole officer and owner of the new company and held signatory authority over its bank accounts, including its escrow account.[25]  In her deposition, Ms. Lalonde testified that the signatures that purported to state her name on various documents were not hers. See A. Lalonde Depo. (5/12/10) , Ex. 35b pp. 61, 62 (DE# 113-2, 8/26/10).  Ms. Lalonde also denied sending and receiving various e-mails and receiving various correspondence. *Id*. p. 50, 52-58, 61, 63-64, 75.  She testified that all of the mail for all of the companies  went to the main receptionist and that the mail was not distributed until S. Lalonde went through it.  *Id*. p. 73-74.

As 1st Guaranty's title and settlement agent, Spectrum prepared loan closing packages for consumers which, among other things, contained documents – in particular, U.S. Department of Housing and Urban Development Settlement Statements (HUD-1 forms) – setting forth specific representations to consumers as to how the proceeds of their new loans would be disbursed.  For example, the HUD-1 forms identified the loan proceeds that would be disbursed to pay off prior

---

[24]   SOUF, ¶¶ 3, 54.  Spectrum replaced an earlier company owned by Stephen Lalonde – Superior Title Guaranty ("Superior") – which had been sued in at least 15 different civil suits in Broward County Court by the time of its dissolution in 2007.  PSJ Ex. 34 (Lewis SJ Decl.), ¶ 30.  An instant message from Toby Shafer, an employee of Spectrum, to another employee, reflects the Lalondes' collective involvement with both Spectrum and Superior: "...Please do not tell people that Spectrum took over Superior's account – Steve and Amy are very big on keeping the companies separate – they do not want them associated with each other."  PSJ Ex. 34 (Lewis SJ Decl.), Att. L.

[25]   SOUF, ¶ 11.  Ms. Lalonde was a joint signatory, with her husband, on an escrow account Superior established at Bank Atlantic on March 14, 2005.  *See* SOUF ¶ 11, citing PSJ Ex. 34 (Lewis SJ Decl.), ¶ 20.  However, Stephen Lalonde was **not** a signatory on Spectrum's escrow account – the account used for payoffs of consumers' mortgages.

mortgages, liens, or judgments, or to pay cash to the consumer.[26]   These disbursement representations in Spectrum's closing packages reaffirmed earlier statements of 1st Guaranty and Spectrum employees to consumers regarding the parties to whom the disbursements would be made.[27]  In her deposition, A. Lalonde testified that she did not prepare any of the HUDs.  *Id*. p. 65.

Contrary to the express representations, beginning in at least February 2007, Spectrum failed to make the promised disbursements.[28]  Specifically, consumer victims who had arranged through Spectrum for new home mortgages began receiving foreclosure notices from "former" lenders who had not been paid off and were no longer receiving monthly payments on their loans.[29]  Moreover, in instances where consumers had also applied for "cash out" refinancing, they did not receive the monies they had been promised.[30]

Consumers began complaining to 1st Guaranty and Spectrum representatives, as well as to Spectrum's underwriter, Stewart Title Guaranty Company ("Stewart Title").[31]  Many of the complainants spoke directly with one or both of the Lalondes about the failed payoffs.[32]  In addition, the consumers spoke with 1st Guaranty managers, who relayed the complaints to S.

---

[26]   SOUF, ¶ 52.

[27]   SOUF, ¶¶ 52, 54.

[28]   SOUF, ¶¶ 55-56.

[29]   SOUF, ¶¶ 56, 67.

[30]   SOUF, ¶¶ 55, 71.

[31]   SOUF, ¶¶ 56, 59-60.

[32]   SOUF ¶¶ 56-58, indicating that at least seven consumers spoke to S. Lalonde and four of these consumers also spoke to A. Lalonde.

Lalonde.[33]  Although S. Lalonde repeatedly assured consumers that their concerns would be addressed, in fact they were not.[34]

As the complaints escalated, Stewart Title's representative, Nicholas Carretta, tried to resolve them with Ms. Lalonde.[35]  Mr. Carretta, routinely communicated with her about title insurance issues over the phone, and by email at amyl@spectrumclose.com, and visited Spectrum every 30 to 45 days to meet with her.[36]  However, beginning in July 2007, he could no longer get through to her.[37]

Later in July or August 2007, Mr. Carretta scheduled an audit of Spectrum, but then had to postpone it when S. Lalonde contacted him to tell him that his wife, A. Lalonde, would not be available.[38]  Mr. Carretta rescheduled the audit for September 2007, but again Ms. Lalonde could

---

[33]  SOUF, ¶ 59.

[34]  SOUF, ¶ 58.

[35]  SOUF, ¶ 61.  Spectrum formalized its relationship with Stewart Title in an agreement signed in February 2006, which contained A. Lalonde's signature in several places.  Among other things, the agreement delineated the responsibilities of Spectrum, as Stewart Title's agent, including the requirement that it maintain an escrow account from which it would disburse funds it received, "only for the purpose for which they were intended."  *See* PSJ Ex. 28 (Declaration of Alan Parrish ("Parrish Decl.")), Att. A (Title Insurance Underwriting Agreement), ¶ 3(e).  Notwithstanding her position as Spectrum's sole officer and her numerous subsequent contacts with Stewart Title, Ms. Lalonde contends, in a personal declaration, which was supplied to Plaintiff a month after her deposition, that the signatures on the agreement are not hers.

[36]  SOUF, ¶ 61.

[37]  SOUF, ¶ 62.  When Carretta visited Spectrum on July 10, 2007, A. Lalonde was unavailable.  PSJ Ex. 27 (Declaration of Nicholas Carretta ("Carretta Decl.")), ¶ 13.

[38]  SOUF, ¶ 62.

not attend.[39]  He could not get through to her by phone, and she did not respond to his emails.[40]

In her deposition, A. Lalonde denied receiving correspondence and various e-mails from Mr.

Carretta. See A. Lalonde Depo. (5/12/10) , Ex. 35b pp. 49, 53-54, 56-58, 62-63, 66-67, 69, 74-

75, 77-78 (DE# 113-2, 8/26/10).  Mr. Carretta also tried to resolve claims with S. Lalonde to no

avail.[41]  Accordingly, on September 25, 2007, Stewart Title cancelled Spectrum's title agency.[42]

    After further unsuccessful attempts to resolve the consumer complaints, on March 6,

Stewart Title sent Spectrum and the Lalondes a demand letter, detailing Spectrum's failure to

disburse loan proceeds.[43]  At the same time, Stewart Title representative Carretta also emailed the

demand letter to each of the Lalondes.[44]

    When this overture likewise produced no results, Stewart Title filed a civil suit against

Spectrum in Broward County Court on June 26, 2008, detailing the matters described in its

---

[39]   SOUF, ¶ 62.

[40]   SOUF, ¶ 62.  At her deposition, Plaintiff provided Ms. Lalonde with a total of nineteen (19)
communications from Stewart Title personnel, S. Lalonde, and consumers, concerning payoff
problems connected with Spectrum during 2007 and 2008 and the possible legal consequences of
that conduct. Notwithstanding the fact that she had full access to her email accounts during this time
period, Ms. Lalonde asserted that she had seen none of the emails.  She speculated that they had been
diverted by her husband without her knowledge.  PSJ Ex. 35b, A. Lalonde Dep. 42:1 - 43:11, 45:11 -
47:20, 48:18 - 49:12, 50:4 - 50:12, 53:23 - 54:3, 54:17-19, 54:25-55, 57:1 - 8, 58:4 - 12, 60:12 -
61:22, 63:16 - 64:7, 65:11 - 67:5, 69:3 - 69:18, 69:12 - 70:22, 71:2 - 72:15, 72:16 - 73:18, 74:8 -
74:22, 74:23 - 75:15,; 77:18 - 78:3, and 78:19 - 79:3, May 12, 2010.

[41]   SOUF, ¶ 63.

[42]   SOUF, ¶ 64.

[43]   SOUF, ¶ 65.

[44]   Id.

11

demand letter.[45]   Confronted by the process server, Ms. Lalonde ran out the back door of

Spectrum's business premises.  The process server then followed Ms. Lalonde and served her at

her residence.[46]

On July 10, 2009, S. Lalonde signed a plea agreement to plead guilty to separate criminal

counts of mail fraud and making misrepresentations to HUD in connection  with Spectrum's

failure to disburse mortgage monies.[47]  In a subsequent stipulated factual proffer, dated

September 21, Lalonde agreed that he engaged in a scheme to defraud homeowners, financial

institutions, and his insurance underwriter through 1st Guaranty and Spectrum.[48]  Specifically, the

proffer stated that Lalonde would obtain borrowers from mostly those seeking to refinance loans,

state in HUD-1s that the original mortgage was being paid off, receive the full payoff amount,

and then fail to pay the borrowers' mortgages.  When borrowers complained, Lalonde claimed

the failed pay off was a clerical error or a mistake, but still failed to make the promised pay

---

[45]   SOUF, ¶ 66, citing PSJ Ex. 28 (Parrish Decl.), Att. F, ¶¶ 19 (a) - (u).  Notwithstanding the fact
that the complaint specifically described 21 separate incidents involving Spectrum's failed payoffs,
Ms. Lalonde claimed, in depositions in this case, she knew nothing about her company's
transgressions until her husband's sentencing a year and a half later. PSJ Ex. 35b, A. Lalonde Dep.
67:10-68:22, May 12, 2010.

[46]   SOUF, ¶ 66, citing the affidavit of the process server.

[47]   SOUF, ¶ 68.  Although the agreement contained a specific provision stating that no charges
would be made against A. Lalonde, it also required, as a precondition, that she surrender all her
licenses related to the mortgage brokering and lending businesses "by the date of Defendant
STEPHEN LALONDE's guilty plea" and that, in addition, she agree to "a permanent disbarment in
the State of Florida to being licensed as a mortgage broker, mortgage lender, mortgage broker
business, correspondent lender, title agent, and or real estate agent."  SOUF, ¶ 70.

[48]   SOUF, ¶ 71.  Lalonde's plea also involved a third corporation, Delta Financial, which is not
named as a Defendant in this matter.

offs.[49]  On December 18, the Court sentenced Lalonde to a 60-month prison term.[50]

### 2.    Defendants' Deceptive Practices Involving Credit Repair Services

Lacking an underwriter for Spectrum's mortgage cash diversion scam, Lalonde moved on to a new fraud – misrepresenting credit repair assistance to credit-impaired consumers who were seeking mortgages.  By at least June 2008, using a new company, Crossland, in tandem with 1st Guaranty, his sales representatives began offering to assist credit impaired consumers in quickly obtaining mortgages.[51]  In May 2009, Lalonde began transitioning the 1st Guaranty-Crossland credit repair operation to a new company, Scoreleaper.[52]  Petroski served as manager of Crossland and Scoreleaper from at least October 23, 2008 through September 2009.[53]

Using Internet advertising, Crossland-1st Guaranty and Scoreleaper invited consumers to fill out forms on line and then call them regarding purported credit repair and mortgage assistance services.[54]  The vast majority of consumers who called had credit scores in the 500s and 400s – substantially below the 620 score, which Defendants claimed would make them

---

[49]  *Id*.

[50]  SOUF, ¶ 73.

[51]  SOUF, ¶ 74.  In fact, Lalonde may have been operating his credit repair operation through 1st Guaranty long before June 2008.  In September 2007 – nine months before he incorporated Crossland – he told a 1st Guaranty manager that he was establishing a new operation that would provide credit repair assistance to consumers who could not otherwise obtain a mortgage.  DE 8-1, pp. 42-43 (TRO Exhibits, Vol. I, Ex. 13 (Declaration of Manny Silva ("Silva Decl.")), ¶ 7).

[52]  SOUF, ¶¶ 5, 74.

[53]  SOUF, ¶¶ 75-76.

[54]  SOUF, ¶ 78.

eligible for a mortgage.[55]  The base charge for the defendants' services was $695 or $698.[56]

Work on the services did not start until consumers paid all or a substantial portion of the fee.[57]

     As testified by former employees, the defendants' sales pitch asserted that, irrespective of

consumers' credit histories, there was a very high likelihood, if not a guarantee, that the

customer's score would improve to a mortgage-worthy level.[58]  Thus, one salesman told a

consumer in a recorded call, ". . . we have a 100 percent money back guarantee.  I've never had

to give anybody back their money.  We've been doing this for 22 years.  We've been successful.

I mean I just took a client from 435 – 435 to 729."[59]  In another call, a sales person assured a

consumer who was complaining about the lack of improvement in his credit score, "...we're

fighting everything that's there.  So everything  will get off.  We have – trust me, there's a

guarantee that it's not going to stay the same."[60]

     With respect to problems on consumers' credit histories, sales personnel told consumers

that they could delete all negative items, even recent bankruptcies.[61]  The deletions would occur

---

[55]  SOUF, ¶ 81.  1st Guaranty and Crossland salesmen portrayed a 620 standard as the "gold standard" for mortgages.  In fact, according to Commission expert, Marietta Rodriguez, it is a bare minimum.  According to Ms. Rodriguez, financial institutions will frequently require a consumer with significant credit issues to have a higher score.  PSJ Ex. 29 (Expert Report of Marietta Rodriguez ("Rodriguez Expert Report")), pp. 6-7.

[56]  SOUF, ¶ 88.

[57]  SOUF, ¶ 89.

[58]  SOUF, ¶ 82, citing PSJ Ex. 21 (Declaration of Frank Cousins ("Cousins Decl.")), ¶ 8; PSJ Ex. 22 (Declaration of Philip Giberson ("Giberson Decl.")), ¶ 7.

[59]  PSJ Ex. 34 (Lewis SJ Decl.), Att. Q at 14:24-15:3.

[60]  SOUF, ¶ 87, citing PSJ Ex. 34 (Lewis SJ Decl.), Att. P at 7: 12-15.

[61]  SOUF, ¶ 84.

in a short period of time – as little as thirty, and no more than ninety days.[62]  Thus, one sales

representative pledged, "Basically what happens is we're going to go into all the derogatory

marks, any judgments, any inquiries or late fees that you might have on your...credit score.  All

those derogatory marks  will actually be deleted like they were never there."[63]

      Petroski participated in the deceptive marketing as a salesman as well as a manager.  As a

Crossland representative, Petroski falsely told one consumer he could improve her score by 100

points within 30 days by disputing all negative items, and that within 3 months she would obtain

a mortgage.[64]  In another instance, as a Scoreleaper representative using his Mike Marshall alias,

he falsely told a consumer he could remove a recent bankruptcy from the consumer's credit

record and improve his score from 575 to 720.[65]  In yet another instance, he attempted to

browbeat a consumer into dropping her complaints about Crossland's non-performance by telling

her that he was the president and owner of Crossland and calling her a "f---ing idiot" for thinking

his company had not done what she had hired them to do.[66]  When the consumer persisted,

---

[62]  SOUF, ¶ 85.

[63]  SOUF, ¶ 83, citing PSJ Ex. 34 (Lewis SJ Decl.), Att. R at 7:10-7:21.  If a consumer had the
presence of mind to ask how Crossland and Scoreleaper achieved their credit repair feats, sales
personnel told them it was by overwhelming credit reporting agencies with dispute letters.  If the
agency did not respond in a timely fashion – 30 days –  the item would be removed.  DE 8, p. 45
(TRO Exhibits, Vol. I, Ex. 14 (Declaration of Rubin Young ("Young Decl.")), ¶ 9).  In fact, as
described in the report of FTC expert Rodriguez, the dispute resolution process, at best only
temporarily suspends a negative item.  Without proof that the negative item is inaccurate, the
item will not be removed, and the credit score will once again be lowered.  PSJ Ex. 29 (Rodriguez
Expert Report), p.10.  Nobody can remove accurate information from a credit report.  Id.

[64]  SOUF, ¶ 30.

[65]  Id.

[66]  SOUF, ¶ 28, citing DE 8-1, p. 23 (TRO Exhibits, Vol. I, Ex.9 (Declaration of Allison Robles
("Robles Decl.")), ¶14).

Petroski said, "Good luck buying a house with your credit score.  You won't be able to buy s--t in this country because you are so irresponsible with paying your bills."[67]

The defendants based their representations solely on consumers' oral representations about their credit histories during sales calls.  They typically did not obtain consumers' credit reports, and, even where they did, they did not obtain the underlying documentation involving negative items in the report.[68]

Numerous consumers confirm the defendants' deceptive marketing representations, in particular the claim that they could remove all negative items, including bankruptcies in short periods of time.[69]  For instance, representatives told one consumer with a credit score in the 400s that their company would remove her recent bankruptcies and raise her score to 700-800 within 30 days;[70] they told another consumer their company would delete all negative items from his credit history, including a recent bankruptcy, and raise his score 145 points within 2-3 months.[71]

As described in the expert declaration of Marietta Rodriguez, the defendants' representations were utterly implausible.  Ms. Rodriguez states that negative information can be removed from a consumers' credit history only if there is documentation that it is incorrect.[72] Moreover, the investigation of credit history challenges is highly complex and variable, based on

---

[67]   *Id.*

[68]   SOUF, ¶ 86.

[69]   SOUF, ¶¶ 30, 83-84.

[70]   SOUF, ¶ 83, citing PSJ Ex. 5 (Declaration of Yolanda Ford ("Ford Decl")), ¶¶ 2-3.

[71]   *Id.,* citing PSJ Ex. 6 (Declaration of Stephen Francis ("Francis Decl.")), ¶¶ 2-3.

[72]   PSJ Ex. 29 (Rodriguez Expert Report), pp. 9-10.

each person's unique situation and can take far longer than the short periods of time postulated by the defendants.[73]   Further, because credit scoring analytics are proprietary, there is no way to predict what numeric impact a particular challenge will have on a credit score.[74]   Thus, Ms. Rodriguez concludes that the defendants' representations, which were based on nothing more than undocumented negative items, were "baseless."[75]

Throughout the 17½ months Crossland and Scoreleaper operated, numerous consumers complained about the companies' failed promises regarding their ability to repair credit and obtain mortgages.[76]  It  was common knowledge among the defendants' employees and managers that virtually nobody obtained a mortgage.[77]   Indeed, as early as December 7, 2007, 1st Guaranty's loan processing manager, Maria Ramirez, queried S. Lalonde in an instant message, "I need lenders – what are we going to do about it."  A month later, in an instant message dated January 15, 2008, she stated, "How are we going to deal with those files we are suppose to be improving scores for."[78]  According to Ms. Ramirez, by the time Crossland began doing business in June 2008, the defendants' ability to obtain mortgages "had almost entirely dried up."[79] Several months later, an assistant to Ms. Ramirez confirmed these observations in a letter

---

[73]   PSJ Ex. 29 (Rodriguez Expert Report), pp. 10-11.

[74]   PSJ Ex. 29 (Rodriguez Expert Report), p. 12.

[75]   *Id.*

[76]   SOUF, ¶ 94.

[77]   SOUF, ¶¶ 91-92.

[78]   PSJ Ex. 24 (Declaration of Maria Ramirez ("Ramirez Decl.")), ¶ 10.

[79]   *Id.*, ¶ 8.

explaining the assistant's reasons for quitting: "I am not able to close any loans to make money . . . . I just do not want to keep misleading borrowers thinking; they are closing. When in reality there is no lender."[80]

The defendants' computer records confirm Ms. Ramirez's observations. The records show that during the 17 ½ month period that Crossland, Scoreleaper, and 1st Guaranty were selling credit repair services linked to mortgages, **not one** of the hundreds of Crossland and Scoreleaper consumers obtained a mortgage.[81]  As for 1st Guaranty, its last closing occurred on October 20, 2008 – 13 months before the Court's TRO in this case.[82]  During the preceding 4½ months – the initial period of Crossland's operation  – 1st Guaranty's computer records show just **four** consumers with mortgage closings.[83]  None of these consumers were Crossland customers.[84]

### 3. Defendants' Deceptive Practices Involving Loan Modification Services

Starting in at least June 2008, S. Lalonde and Petroski also used corporate Defendants, 1st Guaranty, Crossland, and, later, Scoreleaper, to market a loan modification program to consumers, called "loss mitigation."[85]

The defendants' telemarketers represented that they could obtain loan modifications for

---

[80]  SOUF ¶ 92, citing PSJ Ex. 20 (Declaration of Rosemary Coker ("Coker Decl.")), ¶ 7 and Att. B.

[81]  SOUF, ¶ 91.

[82]  *Id*.

[83]  SOUF, ¶ 91.  Since 1st Guaranty purportedly had non-credit impaired consumers in addition to those it referred to Crossland, it is unclear whether the four customers had credit repair issues. Plaintiff was unable to locate any of the four consumers.

[84]  *Id.*

[85]  SOUF, ¶ 95.  Defendants typically referred to their loan modification services as "loss mitigation."  *See* PSJ Ex. 35a, A. Lalonde Dep. 28:10-28:18, Dec. 10, 2009.

18

consumers that would make the consumers' mortgage payments substantially more affordable by lowering their interest rates and monthly payments.[86]  They represented additionally that consumers were highly likely to get such loan modifications.[87]  They charged consumers one-month's mortgage payment in advance for these loan modification services.[88]

The defendants' computer files do not show a single instance in which a consumer received a loan modification.[89]  Numerous consumers complained.[90]  Consumers repeatedly informed sales personnel and managers of 1st Guaranty, Crossland, and Scoreleaper that their companies had not delivered promised modifications.[91]

As in the case of the defendants' credit repair program, Petroski actively participated in the marketing of the loan modification program, as a salesman as well as a manager.[92]  For example, during a telephone call with an FTC investigator, using his Mike Marshall alias, he asserted, based solely on the investigator's oral representations, that he could lower his monthly payments from $2,900 to between $1,600 and $1,800 and secure the modified loan within three to five days.[93]  In a subsequent call two weeks later, Petroski told the investigator that Marshall

---

[86]  SOUF, ¶ 99.

[87]  SOUF, ¶ 100.

[88]  SOUF, ¶ 101.

[89]  SOUF, ¶ 103.

[90]  SOUF, ¶ 102.

[91]  *Id*.

[92]  SOUF, ¶ 96.

[93]  DE 9, p. 33 (TRO Exhibits, Vol. I, Ex. 15 (Lewis TRO Decl.), Att. K, p. 11).  To burnish his credibility, Petroski/Marshall asserted that he was an attorney, that his children went to Harvard, and

was absent, but that he was the owner of Crossland who was filling in for Marshall and could do even better by lowering the investigator's monthly payments to between $900 and $950 per month.[94]  Petroski asserted that his company had "over 200 accounts" with Bank of America (BofA),[95] that "98 percent of my clients [with BofA] . . . get approved"[96] and thus he could "pretty much guarantee that the investigator would get the loan modification.[97]

### C.   DEFENDANTS' ILL-GOTTEN GAINS AND CONSUMER INJURY

Spectrum's theft of mortgage monies resulted in at least $1,886,648 in consumer claims against Stewart Title involving Spectrum's failure, pursuant to its promises, to pay off earlier loans, liens, and judgments, or to supply monies to buyers in "cash out" refinancing agreements.[98]  In addition, Spectrum failed to make at least $314,837.53 in payoffs for other consumers.[99]  Of this total amount ($2,201,486), $1,773,720.78 is attributable to Spectrum's failure to disburse loan proceeds to payoff *refinanced* mortgages.  This is the amount of unjust enrichment directly related to Count 5 of the Complaint.[100]

---

that the just-formed Scoreleaper ("my credit restoration company") had actually been in business for 25 years.  *Id.*, pp. 4, 11-12.

[94]   DE 9-2, pp. 82-83 (TRO Exhibits, Vol. I, Ex. 15 (Lewis TRO Decl.), Att. O, pp. 20-21.

[95]   DE 9-2, p. 70 (TRO Exhibits, Vol. I, Ex. 15 (Lewis TRO Decl.), Att. O, p. 8.

[96]   DE 9-2, p. 71 (TRO Exhibits, Vol. I, Ex. 15 (Lewis TRO Decl.), Att. O, p. 9.

[97]   *Id.*

[98]   SOUF, ¶ 105.

[99]   SOUF, ¶ 107.

[100]    SOUF, ¶ 107, citing PSJ Ex. 34 (Lewis SJ Decl.), ¶ 32.  In accordance with Count 5 of the Complaint DE 1 ¶¶ 58-60), which specifically referred to refinanced mortgages, the FTC's damage figure in the text ($1,773,720.78) excludes Defendants' theft of monies from new mortgages. *Id.,*¶ 32 (d).

As for the defendants' credit repair and loan modification scams, total revenues of Crossland, Scoreleaper, and 1st Guaranty during the 17½ months Crossland and Scoreleaper were operational, were at least $889,794 according to the defendants' sworn financial statements.[101] Thus, total revenues from the defendants scams were at least **$2,663,515**.[102]

## II.    LAW AND ARGUMENT

The uncontroverted facts show that the defendants, S. Lalonde and Petroski, have violated the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679-1679j, the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, and Section 5(a) of the Federal Trade Commission Act

---

[101]   SOUF, ¶¶ 110-113.  Crossland's total revenue was $518,903 (SOUF, ¶ 110); Scoreleaper's total revenue was $116,010 (SOUF, ¶ 111); and 1st Guaranty's total revenue was $279,168 during the 17 ½ month period Crossland and 1st Guaranty were operational.  SOUF, ¶ 113.  The $254,881 1st Guaranty figure is a proportional adjustment of the company's total revenues for 2008 ($279,168 x 7/12), including only the seven months during which Crossland was operating.  *Id.*  However, S. Lalonde's comments to a 1st Guaranty manager in 2007 indicate the credit repair scam was in fact operating long before June 2008.  DE 8-1, pp. 42-43 (TRO Exhibits, Vol. I, Ex. 13 (Silva Decl.), ¶ 7).

During her deposition, A. Lalonde stated that all revenues of Crossland and Scoreleaper were derived from their credit repair and loan modification businesses, but denied that 1st Guaranty received any revenues arising during these operations.  PSJ Ex. 35b, A. Lalonde Dep. 83:1-83:8, May 12, 2010.  However, since the sole apparent *raison d'etre* of 1st Guaranty, based on the testimony of its sales personnel, was to provide mortgage and loan modification services to the credit-impaired consumers of Crossland and Scoreleaper, there is no basis for Ms. Lalonde's comments about its revenues.  SOUF, ¶¶ 79, 86, 95, 103.

[102]   This figure counts only the revenues of three corporate Defendants in this case (1st Guaranty, Crossland, and Scoreleaper).  The financial reports of other Lalonde companies indicate that they earned substantial revenues during the time period Crossland-1st Guaranty and Scoreleaper were offering credit repair and loan modification services.  For instance, Lalonde's company, Capsouth, LLC, earned $1.6 million and his company, Closed First, Inc., earned $1.5 million.  PSJ Ex. 34 (Lewis SJ Decl.), ¶ 28.  In view of the close nexus between Lalonde entities and the intertwined nature of their financial affairs, it is likely that at least a part of revenues attributed to unnamed entities involve earnings from the scams at issue in this proceeding.  PSJ Ex. 32 (Receiver Decl.), ¶ 7; SOUF, ¶¶ 36-37, citing PSJ Ex. 35f, S. Lalonde Dep. 42:5-42:8, 44:13-46:8,  Dec. 9, 2009 (admitting his corporate entities frequently transferred cash to one another pursuant to paperless general loan agreements).

("FTC Act"), 15 U.S.C. § 45(a).  Genuine issues of material fact exist regarding A. Lalonde's individual liability for alleged violations  Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a).  The FTC is entitled to summary judgment in its favor and against the individual defendants, S. Lalonde and Petroski.  Because fact questions exist, the FTC is not entitled to summary judgment as to A. Lalonde's individual liability.

### A.    Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The moving party bears the burden of meeting this exacting standard.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  The substantive law applicable to the case determines which facts are material, *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991), and the Court views the evidence in the light most favorable to the non-moving party.  *Batey v. Stone*, 24 F.3d 1330, 1333 (11th Cir. 1994).  The non-moving party cannot merely rest upon his bear assertions, conclusory allegations, surmises or conjectures.  *Celotex,* 477 U.S. at 322-23; *L.S.T., Inc. v. Crow*, 49 F.3d 679, 684 (11th Cir. 1995).  If the non-moving party fails to submit the necessary sworn affidavits or the concise statement of material fact, the Court may accept all material facts set forth in the Motion as true in accordance with Local Rule 7.5.D of this Court.  The FTC  routinely seeks and is granted summary judgment in its cases.  *See, e.g.*, *FTC v. Peoples Credit First, LLC*, 244 Fed. Appx. 942 (11th Cir. July 19, 2007); *FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009); *FTC v. Global Mktg. Group*, 594 F. Supp. 2d 1281 (M.D. Fla. 2008).

**B.     The FTC Is Entitled to Summary Judgment against S. Lalonde and Petroski.**

In the six counts of its complaint, the FTC alleged that the defendants' three scams

violated the CROA, the TSR, and the FTC Act.  The uncontroverted evidence, described in

Section II above, establishes that the FTC is entitled to judgment as a matter of law on each count

against S. Lalonde and Petroski only.  Questions of fact preclude judgment as a matter of law

against A. Lalonde individually.

**1.     Violations of the Credit Repair Organizations Act ("CROA") (Counts 1 and 2)**

The CROA protects the public from unfair or deceptive advertising and business practices

by credit repair organizations.  15 U.S.C. § 1679(b).  Violations of CROA constitute violations of

Section 5 of the FTC Act.  15 U.S.C. § 1679h(b)(1).

The defendants Lalonde and Petroski meet the CROA's definition of "credit repair

organization":

> [A]ny person who uses any instrumentality of interstate commerce
> or the mails to sell, provide, or perform (or represent that such
> person can or will sell, provide, or perform) any service, in return
> for the payment of money or other valuable consideration, for the
> express or implied purpose of . . . improving any consumer's credit
> record, credit history, or credit rating[.]

15 U.S.C. § 1679a(3)(A).  Defendants Lalonde and Petroski are subject to the CROA because

they used the Internet and telephones to sell, provide, or perform credit repair services for the

purpose of improving consumers' credit records, credit history, or credit rating.  SOUF, ¶ 79; *see*

*Rannis v. Recchia*, 2010 U.S. App. LEXIS 10858, *4-7 (9th Cir., May 27, 2010) (court affirmed

summary judgment finding that an individual defendant, an attorney, met the definition of a

credit repair organization because he acted for the purpose of improving consumers' credit

record, credit history, or credit rating); *Polacsek v. Debticated Consumer Counseling*, 413 F. Supp. 2d 539, 545-54 (D. Md. 2005) (finding a defendant is subject to CROA if it meets the statutory definition even it offers other services, such as credit counseling, and is not wholly a credit repair organization).

The evidence shows that the defendants, Stephen Lalonde and Michael Petroski, violated the CROA, by misrepresenting credit repair services (Count 1 of the Complaint), and by charging for them before they were fully performed (Count 2 of the Complaint).

> **a.    Count 1:  Defendants Stephen Lalonde and Michael Petroski Violated the CROA by Misrepresenting That They Could Remove Truthful, Negative Items from Consumers' Credit Reports, Substantially Improve the Consumers' Credit Scores and Use the Improved Scores to Obtain Home Mortgages for the Consumers.**

The CROA prohibits credit repair organizations from making or using any untrue or misleading representation of their services.  15 U.S.C. § 1679b(a)(3).  To establish violations of the CROA, the FTC must show that Defendants S. Lalonde and Petroski made an untrue or misleading statement regarding their credit repair services.  *FTC v. Gill*, 265 F.3d 944, 955-56 (9th Cir. 2001) (court affirmed order granting summary judgment finding that Defendant made false representations in violation of the CROA, 15 U.S.C. § 1679b(a)(3)).

As discussed in Section II.B.2, above, the defendants, S. Lalonde and Petroski, acting through 1st Guaranty, Crossland, and Scoreleaper, made statements to consumers claiming that 1st Guaranty would obtain mortgage loans for them if they paid Crossland or Scoreleaper to improve their credit scores by removing negative, accurate information from credit reports, including

recent bankruptcies.[103]  In numerous instances, they either guaranteed or stated there was a very high likelihood that consumers would get loans after the credit repair process.[104]  However, the defendants did not remove truthful, negative information, including bankruptcies, from consumers's credit reports to improve their credit scores and get them mortgage loans.[105]

      Accurate information which is not obsolete cannot be deleted from a credit report. The FTC presented uncontroverted evidence that no credit repair company can legitimately remove or enable consumers to remove all negative entries from a consumer's credit report.  The FTC's expert opines that "no one can legally remove timely and accurate information from a credit report."  *See* Expert Report of  Marietta E. Rodriguez on Behalf of Plaintiff Federal Trade Commission.[106]  Accurate credit information can be reported for 7 years, and bankruptcies can be reported for 10 years.[107]  Although consumers can dispute and request an investigation of negative information on credit reports, as the defendants did, if the disputed information is true, it can only be remedied by satisfying the accounts or the passage of time.[108]  Thus, accurate information, such as bankruptcies that are not old enough, cannot be removed, and the defendants' claims that they could were false.

      Ms. Rodriguez also points out that when the defendants made their credit repair claims to

---

[103]   SOUF, ¶ 83-84.

[104]   SOUF, ¶ 87.

[105]   SOUF, ¶¶ 93-94.

[106]   PSJ Ex. 29 (Rodriguez Expert Report), pp. 9 -11.

[107]   PSJ Ex. 29 (Rodriguez Expert Report.), pp. 7-8.

[108]   PSJ Ex. 29 (Rodriguez Expert Report), p. 11.

consumers over the phone, they lacked the documentation about negative items on consumers' credit reports on which to base their representations.[109]  Without such documentation from consumers, the defendants could not make accurate predictions about removing negative items.[110] Even if the defendants had such documentation from consumers, they still could not predict how their credit repair efforts would impact consumers' credit scores because the analytics for deriving credit scores are proprietary to credit reporting agencies and were not transparent to the defendants.[111]  Thus, they could not have predicted that their credit repair efforts would improve credit scores, at all, let alone improve them sufficiently to qualify consumers for loans.[112]  This inability to predict the results of the credit repair process renders entirely misleading claims that consumers were guaranteed to get loans or that there was a high likelihood that consumers would get loans.[113]

The defendants' own tactics made it less likely they would obtain the results they promised consumers.  The defendants' practice of challenging all negative items, whether accurate or not, would lead lenders to suspect the prospective borrowers' credit status.[114]  This was particularly true during the time the defendants made their representations, because by 2007 financial institutions were tightening their credit practices to reflect a downturn in the mortgage

---

[109]   PSJ Ex. 29 (Rodriguez Expert Report), p. 10; SOUF, ¶ 86.

[110]   PSJ Ex. 29 (Rodriguez Expert Report), p. 10.

[111]   PSJ Ex. 29 (Rodriguez Expert Report), p. 12.

[112]   *Id.*

[113]   PSJ Ex. 29 (Rodriguez Expert Report), p. 10.

[114]   PSJ Ex. 29 (Rodriguez Expert Report), p. 11.

market.[115]

By the end of 2007, 1st Guaranty was not obtaining mortgage loans for consumers.  The manager of 1st Guaranty's loan processing department, Maria Ramirez, expressed her concern to Lalonde that 1st Guaranty did not have lenders for its credit repair customers.[116]  Managers and employees were becoming increasingly frustrated about describing a supposed end result (obtaining mortgages for credit-impaired consumers) which was unobtainable.[117]  Rosemary Coker, a 1st Guaranty employee who worked under Maria Ramirez processing loans, gave as a reason for her resignation that she did not want to "keep misleading borrowers thinking; they are closing.  When in reality there is no lender."[118]  The defendants' own record keeping system, which Lalonde could access from his computer, showed that no consumers were obtaining loans.[119]

In sum, the defendants' credit repair representations were unquestionably untrue or misleading.  Thus, the FTC is entitled to summary judgment on the Count 1 allegation that the defendants, S. Lalonde and Petroski, acting through 1st Guaranty, Crossland, and Scoreleaper, violated the CROA.

---

[115]   *Id.*

[116]   SOUF, ¶ 92, citing PSJ Ex.24 (Ramirez Decl.), ¶ 10.

[117]   SOUF, ¶ 92.

[118]   *Id.*

[119]   SOUF, ¶¶ 49, 91.

   **b.**  **Count 2:  Defendants Stephen Lalonde and Michael Petroski Violated the CROA by Charging or Receiving Money for Credit Repair Services Before Such Services Were Fully Performed.**

  The CROA also prohibits charging or receiving any money or other valuable consideration for the performance of credit repair services before they are fully performed.  *See* 15 U.S.C. § 1679b(b).  The defendants, S. Lalonde and Petroski, acting through 1st Guaranty, Crossland, and Scoreleaper, violated this provision of the CROA by charging and receiving payment for credit repair services before they were fully performed.

  The defendants did not start their credit repair services until consumers paid in full.[120]  Even after the defendant Petroski left Scoreleaper in September 2009[121], he continued to charge consumers in advance for credit repair services.  In charging and receiving these advance payments, the defendants violated the CROA.  *See Gill*, 265 F.3d at 956 (court affirmed summary judgment finding that defendant violated the CROA by accepting payment before he had fully performed credit repair services); *Recchia*, 2010 U.S. App. LEXIS 10858 (court affirmed summary judgment against attorney who violated CROA by charging clients before fully performing services in violation of 15 U.S.C. § 1679b(b)).  Thus, no genuine issue of material fact exists in connection with Count 2, and the FTC is entitled to summary judgment.

   **2.**  **Violations of the Telemarketing Sales Rule ("TSR") (Count 3)**

  The TSR was promulgated by the FTC pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to prohibit

---

[120] SOUF, ¶ 89.

[121] SOUF, ¶ 76.

abusive and deceptive telemarketing acts or practices.  Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

The defendants, S. Lalonde and Petroski, acting through the defendants, 1st Guaranty, Crossland, and Scoreleaper, were "seller[s]" or "telemarketer[s]" engaged in "telemarketing," as those terms are defined respectively in the TSR, 16 C.F.R. §§ 310.2(z)[122], (bb)[123], and (cc)[124], because they received telephone calls from customers as part of a program of telemarketing to sell their services in exchange for payment.[125]  *See FTC v. MacGregor*, 360 Fed. Appx. 891, 893-94 (9th Cir. Cal. Dec. 30, 2009) (Defendants were sellers subject to the TSR); *Stefanchik*, 559 F.3d at 930 (same); *Broad. Team, Inc. v. FTC*, 2006 U.S. Dist. LEXIS 8008, *5-6 (M.D. Fla. Jan. 6, 2006) (finding that Defendant was a telemarketer under the TSR).

Among other things, the TSR prohibits sellers and telemarketers from  requesting or receiving an advance payment for a loan or other extension of credit, which they have guaranteed

---

[122]   The TSR defines a "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration."

[123]   The TSR defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor."

[124]   The TSR defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call."

[125]   SOUF, ¶ 79.

or represented they can obtain with a high likelihood of success.  16 C.F.R. § 310.4(a)(4).[126]  As discussed above in connection with their CROA violations (Section III.B.1.b, above), the defendants, S. Lalonde and Petroski, acting through 1st Guaranty, Crossland, and Scoreleaper, demanded advance payment over the phone for the credit repair services that they represented would result in consumers receiving mortgage loans.[127]  In addition, they demanded advance payment over the phone for the loan modification services that they represented would result in consumers receiving modified loans.[128]

The defendants also told consumers who called that they could either guarantee mortgage loans or that there was a high likelihood that they could get consumers mortgage loans after the consumers underwent the credit repair process.[129]  In addition, they represented that there was a high likelihood that hey could obtain loan modifications for consumers.[130]

No genuine issue of fact exists regarding Count 3.  By requesting advance payment via telemarketing for loans that they told consumers they were assured to get, the defendants violated Section 310.4(a)(4) of the TSR.  *See FTC v. Oks*, 2007 U.S. Dist. LEXIS 82170, *4 (N.D. Ill. Nov. 2, 2007) (defendants violated Section 310.4(a)(4) of the TSR).  *FTC v. 120194 Canada,*

---

[126]   Under the TSR, inbound telephone calls initiated by a customer or donor in response to an advertisement through any medium, other than direct mail solicitation, are ordinarily exempt from the TSR.  *See* 16 C.F.R. § 310.6(b)(5).  The TSR, however, covers inbound telemarketing in various instances, including when the calls are made, as here, in connection with requesting advance payment for a loan or other extension of credit.

[127]   SOUF, ¶¶  87,89.

[128]   SOUF, ¶¶  99-101.

[129]   SOUF, ¶ 87.

[130]   SOUF, ¶ 100.

*Ltd.*, 2007 U.S. Dist. LEXIS 12657, *14 (N.D. Ill. Feb. 12, 2007) (same).  Thus, the FTC is

entitled to summary judgment as to Count 3.

      3.      **Violations of the Federal Trade Commission Act ("FTC Act") (Counts 4, 5 and 6)**

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting

commerce."  15 U.S.C. § 45(a).  An act or practice is deceptive under Section 5(a) if: (1) there

was a representation; (2) the representation was likely to mislead consumers acting reasonably

under the circumstances; and (3) the representation was material.  *FTC v. Transnet Wireless*

*Corp.*, 506 F. Supp. 2d 1247, 1266-67 (S.D. Fla. 2007) (citing *FTC v. Tashman,* 318 F.3d 1273,

1277 (11th Cir. 2003).  Express claims and deliberately-implied claims used to induce the

purchase of a product or service are presumed to be material to consumers as a matter of law.

*See In the Matter of Cliffdale Assocs.,* 103 F.T.C. 110, 168 (1984).

      a.      **Count 4: Defendants Stephen Lalonde and Michael Petroski Violated the FTC Act by Representing that They Could Remove Truthful, Negative Items from Consumers' Credit Reports, Substantially Improve the Consumers' Credit Scores, and Use the Improved Scores to Obtain Home Mortgages for Consumers.**

As discussed in Section III.B.1.a in connection with Count 1, the defendants, Lalonde and

Petroski, acting through 1st Guaranty, Crossland, and Scoreleaper, misrepresented to consumers

that they could substantially improve consumers' credit scores by removing truthful negative

items and then could obtain mortgage loans for them.  As shown by numerous consumer and

employee declarations, the defendants' own records, and the FTC's expert report, the defendant's

promises were false and mislead reasonable consumers.  The claims were express claims made to

induce the purchase of the defendants' credit repair services and thus, are presumed to be

31

material to consumers as a matter of law.  The defendants, Lalonde and Petroski, violated Section 5(a) of the FTC Act and the FTC is entitled to summary judgment on Count 4.

> **b.     Count 5: Defendant, Stephen Lalonde, Violated the FTC Act by Misrepresenting That He Would Obtain Refinanced Home Mortgage Loans for Consumers and Use the Proceeds of Those Loans to Payoff Consumers' Existing Mortgage Loans Fully and Promptly.**

In Count 5, the FTC seeks summary judgment against Stephen Lalonde and Amy Lalonde for violations of the FTC Act.  The FTC asserts that the defendants, S. Lalonde and A. Lalonde, acting through the corporate defendants, 1st Guaranty and Spectrum, represented to consumers, orally as well as in loan closing documents such as HUD-1 forms, that disbursements from their new loans would be made fully and promptly to specifically named parties, such as former lenders.[131] The record evidence of employee and consumer declarations in this action as well as the prior criminal action against S. Lalonde shows that in numerous instances, borrowers' loan proceeds were not disbursed as represented.[132]

The evidence submitted by the FTC does not show A. Lalonde's direct participation in the misrepresentations.  In her deposition, A. Lalonde disputes her knowledge of the deceptive practices of Spectrum.  Ms. Lalonde disputes that signatures on various documents were hers. *See* A. Lalonde Depo. (5/12/10) , Ex. 35b pp. 61, 62 (DE# 113-2, 8/26/10).  Ms. Lalonde also denied sending and receiving various e-mails and receiving various correspondence. *Id*. p. 50, 52-58, 61, 63-64, 75.  A. Lalonde specifically denied receiving certain correspondence and

---

[131]    SOUF ¶ 52.

[132]    SOUF ¶ 56, 71, 92.

various e-mails from Mr. Carretta. <u>See</u> A. Lalonde Depo. (5/12/10) , Ex. 35b pp. 49, 53-54, 56-58, 62-63, 66-67, 69, 74-75, 77-78 (DE# 113-2, 8/26/10).   Thus, fact issues exist that preclude summary judgment in the FTC's favor as to A. Lalonde's individual liability for alleged violations of the FTC Act.

The representations misled consumers, who stopped paying their old mortgages and subsequently found themselves threatened with foreclosure or even undergoing foreclosure of their homes.[133]   The representations were material to consumers since they were instrumental in affecting consumers' decisions to pay for goods and services.  *See Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992).  As opined by the FTC's expert, it is unlikely that consumers would have sought loans from 1st Guaranty and paid settlement and closing costs to both 1st Guaranty and Spectrum unless they expected their prior mortgages to be paid off.[134]  S. Lalonde did not present record evidence to dispute the FTC's evidence that his misrepresentations were deceptive under Section 5(a) of the FTC Act.  The FTC is entitled to summary judgment as to Count 5 against S. Lalonde.  Because genuine issues of material fact exist regarding A. Lalonde's role and knowledge of the deceptive acts, the FTC is not entitled to summary judgment as to Count 5 against her.

       **c.**      **Count 6: Defendants, Stephen Lalonde and Michael Petroski Violated the FTC Act by Misrepresenting That They Would Obtain for Consumers Mortgage Loan Modifications That Would Make Consumers' Mortgages Substantially More Affordable.**

Finally, the defendants, S. Lalonde and Petroski, acting through 1st Guaranty, Crossland,

---

[133]   SOUF ¶¶ 56.

[134]   PSJ Ex. 29 (Rodriguez Expert Report), p. 13.

and Scoreleaper, falsely represented that they would obtain modifications of consumers' existing mortgages to make them more affordable.[135]  The defendants claimed that they could reduce consumers' interest rates and lower their monthly payments on existing mortgage loans, and that consumers could get these loan modifications quickly.[136]  Like all of their other claims described herein, the defendants' loan modification claims were false.  The defendants' own records establish that they failed to modify a single mortgage as evidenced by consumer and employee declarations.[137]  Likewise, the FTC's expert opined that the representations were baseless. At the time they made their sales pitch, the defendants lacked the requisite documentation from borrowers relating to their income, employment, debt and the delinquent status and payment history of the loan.[138]  The defendants also lacked the necessary information from the mortgage servicers and investors on which to base their specific promises of reduced interest rates, reduced monthly payments, and quick turn around times.[139]  The FTC's expert explained that approving loan modifications is at the discretion of the mortgage servicers and investors, who consider several factors in determining whether a loan should be modified or foreclosed.[140]  The expert also averred that it would not have been possible for the defendants to make predictions about

---

[135]   SOUF ¶ 99.

[136]   *Id*.

[137]   SOUF ¶¶ 102-103.

[138]   PSJ Ex. 29 (Rodriguez Expert Report), p. 16; SOUF ¶ 99.

[139]   *Id*.

[140]   *Id*.

specific turn around times given the complexity of the loan modification process.[141]

The defendants' false loan modification representations misled consumers who reasonably believed that they would receive more affordable, modified loans. The representations were express claims that were material to consumers. Thus, the uncontroverted facts show that no genuine issue of material fact exists that the defendants violated Section 5(a) of the FTC Act in connection with Count 6. *See FTC v. Dinamica Financiera*, Civil No. 209-cv-03554-MMM-PJW, 17-21 (C.D. Cal. Aug. 19, 2010) (court granted summary judgment finding that defendants misrepresented loan modification services).

### C.    The Individual Defendants, S. Lalonde and Petroski, Are Subject to Injunctive Relief and Monetary Relief.

#### 1.    Legal Standard

The Clerk's Default (DE# 56, 2/4/10) entered against the corporate defendants, 1st Guaranty, Spectrum, Crossland, and Scoreleaper establishes corporate liability in this action. *Buchanon v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987). "Once the FTC has established corporate liability, 'the FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them ... The FTC must then demonstrate that the individual had some knowledge of the practices.'" *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 470 (11th Cir. 1996) (quoting *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989). To satisfy the knowledge requirement, the FTC must show that the individual had

> 'actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'

---

[141]    *Id*.

35

*Amy Travel Service*, 875 F.2d at 574 (quoting *FTC v. Kitco*, 612 F. Supp. 1292, 1292 (D. Minn.

1985)).  Additionally, "'[a]n individual's status as a corporate officer gives rise to a presumption

of ability to control a small, closely-held corporation.'" *FTC v. Transnet Wireless Corp.*, 506 F.

Supp. 2d 1247, 1270 (S.D. Fla. 2007) (quoting *FTC v. Windward Mktg.*, 1997 WL 33642380,

*25 (N.D. Ga. Sept. 30, 1997) (quoting *Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403

(D.C. Cir. 1973)).  "'The degree of participation in business is probative of knowledge.'" *Amy

Travel Service*, 875 F.2d at 574 (citation omitted).   Proof of intent to defraud is not required to

satisfy the knowledge requirement.  *Transnet Wireless Corp.*, 506 F. Supp. 2d at 1270 (citation

omitted). In  *Amy Travel Service,* the Seventh Circuit acknowledged that "the knowledge

requirement is the key issue in this case." *Amy Travel Service*, 875 F.2d at 573.

The Court can order injunctive relief against individual defendants for violations of

Section 5(a) of the FTC Act if the individuals participated directly in the deceptive acts or

practices or had the authority to control them. *Gem Merchandising Corp.*, 87 F.3d at 470

(quoting *FTC v. Amy Travel Serv., Inc.*, 875 F.2d at 573); *Transnet Wireless Corp.*, 506 F. Supp.

2d at 1270.  Additionally, the Court may order monetary relief against the individual defendants

if they had or should have had knowledge or awareness of the misrepresentations.

The FTC's uncontroverted evidence shows that S. Lalonde and Petroski are individually

liable for their violations and are subject to both injunctive and monetary relief.

### 2.      Individual Liability of Stephen Lalonde

In S. Lalonde's Plea Agreement and subsequent Stipulated Factual Proffer at the time he

entered his guilty plea, he stated that he falsely represented on the HUD-1 forms of six

consumers that their prior mortgages would be paid off, thereby causing more than a million

dollars in damage claims.[142]  Pursuant to the doctrine of collateral estoppel, Lalonde cannot now

relitigate these critical elements in the context of the FTC's civil complaint involving Spectrum's

failure to honor promises to disburse mortgages.  *See Emich Motors Corp. v. General Motors

Corp.*, 340 U.S. 558, 568 (1951) ("It is well established that a prior criminal conviction may

work an estoppel in favor of the Government in a subsequent civil proceeding."; *Blohm v.

Commissioner of Internal Revenue*, 944 F.2d 1542, 1553 (11th Cir. 1993) (collateral estoppel

applies where the party and issues are identical and the issue has been decided in the prior

proceeding); *Tomlinson v. Lefkowitz*, 334 F.2d 262, 264 (5th Cir. 1964) ("[A]n issue resolved in

favor of the United States in a criminal prosecution may not be contested by the same defendants

in a civil suit brought by the Government.")(citation omitted); *Refined Sugars, Inc. v. S.

Commodity Corp.*, 709 F. Supp. 1117, 1120 (S.D. Fla. 1988) ("[U]se of a criminal conviction is

well justified because of the higher standard of proof and greater procedural protections attaching

to a Defendant in a criminal prosecution.").[143]  Thus, Lalonde is estopped from challenging the

FTC's charge that he violated Section 5(a) of the FTC Act, 15 U.S.C. §45(a), by failing to honor

promises to disburse monies from consumers' refinanced mortgages.[144]

    The uncontroverted material facts in this case establish that, as the sole owner of 1st

Guaranty and as a co-manager of Spectrum, S. Lalonde had authority to make the disbursements

---

[142]   SOUF ¶¶ 70-71, citing DE 23 ( Plea Agreement) and DE 24 (Stipulated Factual Proffer).

[143]   Collateral estoppel applies to issues in a prior criminal conviction whether the conviction is
pursuant to a jury verdict or a guilty plea.  *United States v. Killough*, 848 F.2d 1523, 1528 (11th Cir.
1988).

[144]   Additionally, the factual statements in Lalonde's Plea Agreement and Stipulated Factual Proffer,
cited above constitute an admission for the purposes of this civil action.  *Killough*, 848 F.2d at 1528.

his companies had promised to consumers on HUD-1 forms and in prior sales representations.[145] Instead, after reiterating the promises in numerous one-on-one conversations with consumers, he repeatedly failed to honor them.[146]  Lalonde knowingly participated in his companies' mortgage fraud.  *See Transnet Wireless Corp.*, 506  F. Supp. 2d at 1270.

With respect to the credit repair and loan modification frauds, Lalonde had the authority to control as he was the hands-on sole owner of each of the corporations that perpetrated the fraud.[147]  He was present at all times on the business premises of his companies and monitored the activities of his salesmen and managers, using a video and audio system, as well as company-wide instant message and e-mail systems.[148]  Additionally, Lalonde was the sole or joint signatory on all bank accounts of the defendant corporations.[149]

The FTC has met the knowledge requirement with testimony of Lalonde's managers and his own records that indicate that he was fully apprised of customer complaints concerning his companies.  Lalonde's audio system provided him with records of the sales calls of his employees – calls which, as the plaintiff's transcripts demonstrate, revealed all of the fraudulent practices engaged in by his credit repair and loan modifications businesses.[150]  Finally, through an office-wide computer network, he had day-to-day access to performance records of his

---

[145]   SOUF ¶¶ 6-7, 54.

[146]   SOUF ¶¶ 56, 65, 92.

[147]   SOUF ¶¶ 6-7.

[148]   SOUF ¶¶ 8, 42, 46.

[149]   SOUF ¶ 6.

[150]   SOUF ¶ 42.

companies, including information as to whether they were, in fact, honoring promises they made to consumers.[151] *See Amy Travel*, 875 F.2d at 574 ("[T]he degree of participation in business affairs is probative of knowledge.").  The uncontroverted evidence establishes Lalonde's individual liability for the violations asserted in Counts 1 through 6 of the complaint.  Having established individual liability, the FTC is entitled to injunctive and monetary relief against Lalonde.

> **3.      Fact Questions regarding Knowledge Preclude Summary Judgment as to Amy Lalonde's Individual Liability.**

Ms. Lalonde's ability to control with respect to Spectrum's failure to honor mortgage payoff obligations can be presumed by the fact that she was the sole officer of Spectrum. *Transnet Wireless*, 506 F. Supp. 2d at 1270 (citing *FTC v. Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114, * 38 (N.D. Ga. Sept. 30, 1997)("An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation."); *see also Amy Travel Serv., Inc.*, 875 F.2d at 573 (authority to control a company is evidenced by the assumption of duties of a corporate officer).  Ms. Lalonde was Spectrum's president.  She was the sole signatory on Spectrum's escrow account.  She held herself out as Spectrum's president in her dealings with Spectrum's underwriter, Stewart Title.  She prepared title commitments and title insurance policies.[152]  Notwithstanding the presumption of A. Lalonde's ability to control Spectrum based on her position as president, the record evidence does not establish as a matter of law that she knew or should have known about the deceptive practices of Spectrum.  The FTC

---

[151]    SOUF ¶¶ 43, 46.

[152]    SOUF ¶¶ 7, 10-12, 15, 20, 61.

relies on certain consumers' declarations to show that she knew or should have known.[153] However, in her deposition, A. Lalonde repeatedly denies sending and receiving a variety of e-mails and correspondence that the FTC offers to show knowledge. She also disputes her signature on several documents. See A. Lalonde Depo. (5/12/10) , Ex. 35b pp. 61, 62 (DE# 113-2, 8/26/10). Ms. Lalonde also denied sending and receiving various e-mails and receiving various correspondence, including correspondence from Stewart Title. Id. p. 50, 52-58, 61, 63-64, 75. In her deposition, she testified that all of the mail for all of the companies went to the main receptionist and that the mail was not distributed until S. Lalonde went through it. Id. p. 73-74.

Because genuine issues of fact exist regarding A. Lalonde's knowledge or lack thereof, the FTC is not entitled to summary judgment against A. Lalonde individually. See Gem Merchandising, 87 F.3d at 468 (denying summary judgment as to individual liability for consumer redress and eventually ruling after a non-jury trial); see also Amy Travel, 875 F.2d at 573 (tried by consent before a magistrate judge) (noting that knowledge was the key issue in the

---

[153] The Court finds that the fact questions regarding knowledge raised by A. Lalonde's deposition that was filed by the FTC are adequate to defeat the FTC's motion for summary judgment. The Court notes that Ms. Lalonde submitted declarations of herself and various employees that essentially state that she never participated in closings and that any problems involving Spectrum's failure to make promised disbursements were entirely S. Lalonde's fault. See Defendant, Amy Lalonde's, Statement to Controverted Material Facts and exhibits thereto (DE# 119, 9/10/10). The FTC argues that such self-serving declarations based on information and belief are inadequate to defeat summary judgment. The declarations were made subject to perjury and raise genuine issues of material fact regarding her knowledge of the deceptive acts. In her declaration, Ms. Lalonde expressly states that she "never prepared a HUD-1 Closing Statement or prepared a closing package for Spectrum Title, Inc" and she specifically identifies documents and checks that do not contain her signature. See Id. Exhibit 6, Declaration of Amy Lalonde ¶ 5 (DE# 119, 9/10/10).

case).

### 4.        Individual Liability of Michael Petroski

The defendant, Petroski, had the authority to control the deceptive practices of Crossland and Scoreleaper.  In opposition to the FTC's motion for summary judgment, Petroski failed to file an affidavit or any other record evidence to support his opposition.  The non-moving party cannot rest upon his bare assertions, conclusory allegations, surmises or conjectures.  *Celotex*, 477 U.S. at 322-23; *L.S.T., Inc. v. Crow*, 49 F.3d 679, 684 (11th Cir. 1995).  If the non-moving party fails to submit the necessary sworn affidavits or the concise statement of material facts, the Court may accept all material facts set forth in the Motion as true in accordance with Local Rule 7.5D of this Court.

In his Response, Petroski admits to following the script provided to him by Mr. Lalonde and states that he "assumed these were truthful & that they complied with the Regulations of the F.T.C."  Petroski Response p. 2 (DE# 151, 11/20/10).  He also admits that he was a supervisor to dispute items on customer credit reports through 1st Guaranty.  *Id*.  Without an affidavit or other record evidence, Petroski baldly argues that he "was not a manager of 1st Guaranty, an owner or stock holder for Crossland, and had no authority over anyone that worked for 1st Guaranty."  *Id*. at 3.  Petroski argues that the FTC has not named other managers such as Craig Cohen, Phil Giberson and Frank Cousins in this action.  *Id*. at 4.  Whether or not the FTC names other individuals has no bearing on Petroski's liability.

In his Response, Petroski expressly admits that he worked for Crossland between June 2008 and October 2008, that he became a Crossland manager for approximately seven months starting in late October 2008, and offered consumers credit repair services that would enable

them to get mortgage loans through 1ˢᵗ Guaranty.  *Id*. at 1-2.  Additionally, Petroski admits that he worked for Scoreleaper for approximately 60 days and fails to dispute that he was a Scoreleaper manager.  *Id*. at 7; SOUF at ¶ 26.   He also admits that he continued to provide credit repair services to consumers after he left the employment of Crossland and Scoreleaper.  *Id*. at 9; SOUF at ¶ 32.  Petroski admits that "mistakes were made on his part by telling the F.T.C. that he was the owner and President of Crossland, and other statements that were fabricated," and "accepts responsibility for any statements he made."  *Id*. at 7, 9.

The uncontroverted evidence shows that Mr. Lalonde made Petroski the manager of Crossland and Scoreleaper.[154]  Petroski failed to submit any record evidence to refute the FTC's Statement of Uncontroverted Facts.  As a non-moving party, Petroski cannot merely rest upon his bare assertions, conclusory allegations, surmises or conjectures.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Where, as here, the non-moving party fails to submit the necessary sworn affidavits or the concise statement of material fact, the Court may accept all material facts set forth in the motion as true in accordance with Local Rule 7.5D of this Court.

Petroski communicated to consumers that he had the authority to control the defendants' practices by holding himself out as Crossland's president and owner.[155]  Petroski fails to dispute the evidence that consumers were told that truthful, negative items would be removed from their credit reports to get them mortgages. *Id*. at 2;  SOUF at ¶ 30, 83.  He also fails to dispute that, at the time defendants made their representations, they did  not have documentation from consumers showing that negative items on their credit reports were inaccurate. SOUF at ¶ 86;

---

[154]   SOUF, ¶ 26.

[155]   SOUF, ¶ 28.

(Rodriguez Expert Report) PSJ Ex. 29 p.10.  Petroski does not offer any evidence disputing that

he represented to consumers that legitimately reported bankruptcies could be removed from their

credit reports. SOUF at ¶ 30, 84.  He fails to dispute the testimony of the FTC's expert that

truthful, negative information cannot be removed from credit reports through the dispute process;

that disputing truthful information would at best only result in temporary removal of the disputed

items while credit reporting agencies investigated them; and that any improvement in credit

scores resulting from such disputes would be temporary.  (Rodriguez Expert Report) PSJ Ex. 29

at pp. 9-11; SOUF at ¶ 93 (citing the declaration of consumer Sonia Shook, PSJ 13 at 3-4, stating

that her husband's credit score did not change, and that truthful negative items on his credit

report – which the defendants fraudulently disputed as resulting from identity theft – were only

temporarily removed from his credit report only to be reinstated).  Petroski admitted that the

ultimate goal of the credit repair services  was to obtain mortgage loans.  Petroski Response at 2,

7 (DE 151, 11/20/10); SOUF at ¶¶ 30, 80-82.  Petroski knew this was the ultimate goal and

admitted that "once client scores were improved they would be receiving a loan through Mr.

Lalonde's company."   Petroski Response at 2 (DE# 151, 11/20/10).  Petroski does not offer

evidence to refute the fact that consumers did not get loans or loan modifications. SOUF at ¶¶

90-92, 94, 102-103.  He does not controvert evidence from consumers, the defendants' own

computer records, and defendants' employees, including Maria Ramirez, Frank Cousins, Philip

Giberson, Rosemary Coker, and Rubin Young, that show that the defendants' credit repair

customers did not get promised mortgage loans.  *Id.*

      With respect to knowledge, Petroski directly participated in Crossland and Scoreleaper's

frauds by making false and misleading credit repair and loan modification representations to

consumers as well as an FTC investigator.[156]  When he left the defendants' employment in

September 2009, he continued making misrepresentations to consumers.[157]   Petroski's

participation, control, and knowledge of the challenged deceptive practices makes him liable for

them.  *See MacGregor*, 360 Fed. Appx. at 894-95 (court upheld summary judgment against

individual defendant where evidence was undisputed that he participated directly in deceptive

practices and likely knew of material misrepresentations, or was at least recklessly indifferent to

the truth).  Petroski's opposition fails to raise any genuine issue of material fact.  The FTC is

entitled to summary judgment in its favor against Petroski for Counts 1-4 and 6.

## C.    Remedy for Stephen Lalonde's and Michael Petroski's Violations

The FTC seeks both monetary and injunctive relief to remedy Lalonde's and Petroski's

violations and to fence in their future conduct.  Section 13(b) of the FTC Act provides that "in

proper cases, the Commission may seek, and after proper proof, the court may issue a permanent

injunction."  15 U.S.C. § 53(b); *Gem Merchandising Corp.*, 87 F.3d at 468; *FTC v. U.S. Oil &*

*Gas Corp.*, 748 F.2d 1431, 1433 (11th Cir. 1984); *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107,

1109-11 (9th Cir. 1982).[158]  Without such injunctive relief, Lalonde and Petroski are likely to

once again engage in deceptive practices.  *FTC v. U.S. Oil & Gas Corp.*, 1987 U.S. Dist. LEXIS

16137, 50-51 (S.D. Fla. July 10, 1987) (citations omitted) (a permanent injunction is warranted

when there is a cognizable danger of recurrent violation or some reasonable likelihood of future

violations).  The grant of permanent injunctive power gives the Court broad equitable authority

---

[156]   SOUF, ¶¶ 30-31, 96.

[157]   SOUF, ¶ 32.

[158]   The phrase "proper case," above, refers to a case involving a violation of a law enforced by the
FTC.  *See H.N. Singer, Inc.*, 668 F.2d at 1113.

to order a monetary judgment for restitution, as well as disgorgement of the defendants' ill-gotten gains. *Gem Merchandising*, 87 F.3d at 469-70.

Injunctive relief is warranted. Lalonde and Petroski should be enjoined from the practices alleged in the Complaint, including fencing-in relief to deter them from violating the law in the future. Because of the repetitive, long standing nature of their fraudulent conduct, notwithstanding their awareness of judicial proceedings stemming from such misconduct, the fencing-in provisions include bans from engaging in the sale of mortgages and credit repair and loan modification services, and from all telemarketing. Lalonde and Petroski are liable for equitable monetary relief to redress consumers and to disgorge their ill-gotten gains. Reporting and monitoring provisions are also appropriate under the circumstances. *See FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1276 (S.D. Fla. 1999).

### 1. Bans Against Defendants Stephen Lalonde and Michael Petroski Engaging in Mortgage-Related Activities, Credit Repair, and Telemarketing

District courts have banned defendants in FTC cases from engaging in certain activities to ensure the effectiveness of injunctive relief where the defendants demonstrate blatant disregard of the law. *See FTC v. Five Star Auto Club, Inc.*, 2000 U.S. Dist. LEXIS 10548 (S.D.N.Y. June 9, 2000) (permanent injunction banned defendants from engaging in multi-level marketing); *FTC v. Micom Corp.*, 1997 U.S. Dist. LEXIS 3404 (S.D.N.Y. Mar. 12, 1997) (on summary judgment, court banned defendants from the promotion, advertising, marketing, sale, or offering for sale of any U.S. government licenses or permits and certain investment offerings). The Court agrees that the defendants, S. Lalonde and Petroski, should be enjoined from engaging in the sale and provision of mortgage, credit repair, and loan modification services, and from engaging in

telemarketing.

> **a.      Stephen Lalonde**

Beginning in at least February 2007 with his fraud involving undisbursed mortgage monies, S. Lalonde engaged in three separate scams involving the mortgage loan industry and credit repair.  When his fraud involving Spectrum's theft of mortgage monies collapsed because the underwriter for the company terminated its contract, Lalonde switched to his credit repair and loan modification scams.  Even after agreeing to surrender all Florida licenses involving his mortgage and lending businesses as part of a guilty plea in a criminal case arising from his first scam, Lalonde continued his credit repair and loan modification fraud for another four months, switching his operation to a new location in Ft. Lauderdale.  In effectuating his scams, Lalonde used a wide array of interrelated companies, including the four corporate defendants.

Lalonde's repetitive fraudulent conduct, even in the face of ongoing legal proceedings, demonstrates that he cannot be trusted to engage lawfully in the mortgage, credit repair, or loan modification businesses.  Moreover, Lalonde's past behavior shows that he presents too great a risk of serious economic injury to vulnerable consumers seeking credit and mortgage assistance in this venue.  Numerous courts have ordered similar bans at summary judgment to protect consumers.  *See FTC v. Dinamica Financiera,* Civil No.  2:09-cv-03554-MMM-PJW, 17-21 (C.D. Cal. Aug. 19, 2010) (on summary judgment, court banned defendants from advertising, marketing, promoting, offering for sale, or selling any mortgage loan modification or foreclosure relief service); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1049 (C.D. Cal. 1999) (on summary judgment, court banned defendants from participating in the advertising, promoting, offering for sale, sale, performance, or distribution of any credit repair service); *FTC v. Wilcox*, 926 F. Supp. 1091,

1106 (S.D. Fla. 1995) (on summary judgment, court banned defendants from direct mail

marketing of prize-promotions); *FTC v. Check Investors, Inc.*, 2005 U.S. Dist. LEXIS 37199, *8

(D.N.J. July 18, 2005) (on summary judgment, court permanently restrained and enjoined

defendants from engaging or assisting others engaged in debt collection activities); *FTC v. Voc.

Guides, Inc.*, 2009 U.S. Dist. LEXIS 29522, *52-53 (M.D. Tenn. Apr. 6, 2009) (court modified

order to enjoin defendant from participating in any business connected with grant procurement).

 The common thread underlying Lalonde's repetitive fraudulent endeavors - whether they

were the mortgage brokerage business or providing credit repair or loan modification services - is

his use of telemarketing.  Given the transferable nature of telemarketing as a marketing tool and

the high likelihood that his future use of telemarketing will lead to great harm to consumers, an

injunction against telemarketing is also necessary and appropriate.  The FTC's proposed order

includes a definition of telemarketing that applies the injunction to "a plan, program, or

campaign that is conducted to induce the purchase of goods or services by means of the use of

one or more telephones."[159]  The definition will prevent Lalonde from using the telephone to

orchestrate future deceptive marketing campaigns.  At the same time, it will allow incidental

telephone use where there is no "plan, program or campaign."  Courts have banned defendants

who have demonstrated a propensity to use telemarketing to deceive consumers in other FTC

cases.  *See FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013, 1017-1018 (N.D. Ind. 2000)

(on summary judgment, court enjoined defendants from engaging in or assisting others who are

---

[159]   The telemarketing definition proposed herein has been used in recent FTC final orders.  *See, e.g.*, *FTC v. Voc. Guides, Inc.*, 2009 U.S. Dist. LEXIS 29509, *5; and *FTC v. Pac. First Benefit, LLC*, 472 F. Supp. 2d 981, 985 (N.D. Ill. 2007).

engaged in the business of telemarketing and the business of marketing career advisory goods or services); *Voc. Guides, Inc.*, 2009 U.S. Dist. LEXIS 29522, *52-53 (court modified order to enjoin defendant from telemarketing).

### b.    Michael Petroski

Like S. Lalonde, individual defendant, Michael Petroski, has engaged in repetitive, widespread fraud involving mortgage, credit repair, and loan modification activities.  Serving as the manager of corporate defendants, Crossland and Scoreleaper, Petroski telemarketed bogus credit repair and mortgage products to credit-impaired customers.  Without any basis, he promised consumers that Lalonde's companies could repair their damaged credit histories, irrespective of how low their scores were, and then obtain mortgages for them.  He also promised consumers, without substantiation, that he could obtain modifications of their mortgages with huge reductions in interest rates and monthly payments.

After he stopped working for Lalonde in September 2009, Petroski began working on his own, still posing as a representative of Crossland and Scoreleaper, and cheating consumers over the phone.  He evaded service in this case and continued his deceptive practices until at least April 2010, notwithstanding the fact he was aware of this proceeding by the first week of December 2009.  This habitual misconduct shows that he will engage in similar misconduct in the future unless the Court prohibits him from providing mortgage, credit repair, and loan modification services, and from engaging in telemarketing.

### 2.    Other Injunctive Provisions

The FTC is entitled to a permanent injunction that enjoins defendants, Lalonde and Petroski, from making any false or misleading statements in connection with the sale of any

48

goods or services, to prevent them from putting their victims once again in harms way.  In addition, the order would enjoin them from using customer information they obtained in connection with the deceptive practices of the corporate defendants to prevent them from profiting from information they obtained through deception.  *Litton Indus., Inc. v. FTC*, 676 F.2d 364, 370 (9th Cir. 1982) (fencing-in provisions serve to close all roads to the prohibited goal, so that orders may not be bypassed with impunity).  *See FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1276 (S.D. Fla. 1999).

### 3.    Monetary Relief

The Court has the equitable authority under the FTC Act, 15 U.S.C. §§ 41 *et seq.*, to order monetary relief.[160]  *McGregor v. Chierico*, 206 F.3d 1378, 1388-89 (11th Cir. 2000).  The Court may order restitution to consumers in the amount of consumer losses to compensate them for the harm caused by the defendants' misrepresentations.  *Id.*; *Slimamerica*, 77 F. Supp.2d at 1276; *FTC v. Freecom Communs.*, *Inc.*, 401 F.3d 1192, 1207 (10th Cir. 2005) (upholding restitution); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) (same).  Or it may order disgorgement to deprive the defendants of their ill-gotten gains.  *See Gem Merchandising Corp.*, 87 F.3d at 470; *FTC v. Direct Marketing Concepts, Inc.*, 648 F. Supp. 2d 202 (D. Mass. 2009).  Because the defendants made widely-disseminated, material misrepresentations, and consumers purchased the defendants' mortgage financing, credit repair, and loan modification services, the Court may presume consumers' reliance on thedefendants' deceptive statements, and may order restitution or disgorgement.  *See Chierico*, 206 F.3d at

---

[160]    As noted in Section III.B.1. and III.B.2., violations of the CROA and the TSR are violations of Section 5 of the FTC Act.  *See* 15 U.S.C. § 1679h(b)(1); 15 U.S.C. § 6102(c); and 15 U.S.C. § 57a(d)(3).

1387-89; *Freecom Communs., Inc.*, 401 F.3d at 1206; *Security Rare Coin & Bullion Corp.*, 931 F.2d at 1315-16.

The Court finds the defendants, S. Lalonde and Petroski, jointly and severally liable for restitution in connection with Counts 1-4, and 6, and defendant, S. Lalonde, individually liable for disgorgement in connection with Count 5.  In connection with Counts 1-4, and 6, restitution would compensate consumers for the money they paid for credit repair and loan modification services they did not receive.  In connection with Count 5, disgorgement is the more appropriate remedy.  Stewart Title, Spectrum's title insurance company, stepped in to pay title claims to avoid injury to borrowers and lenders resulting from Lalonde's failure to make the disbursements.  Disgorgement would deprive Lalonde of his unjust enrichment.  *See Gem Merchandising Corp.*, 87 F.3d at 470.

Damages for consumer injury are calculated by determining the gross sales.  *See Chierico*, 206 F.3d at 1386-87 (11th Cir. 2000) (affirming the district court's assessment of damages in the amount of gross sales, that is, $7.2 million).   Once the FTC shows that its calculations of restitution and disgorgement reasonably approximate the amount of consumers' net losses or defendants' unjust enrichment, the burden shifts to the defendants to show that the FTC's figures are inaccurate.  *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997); *Think Achievement Corp.*, 144 F. Supp.2d at 1019; *Direct Marketing Concepts, Inc.*, 648 F. Supp. 2d at 214.  As described in detail in Section II.C, using the gross revenues reported in the corporate defendants' sworn financial statements, the total damages caused by the three separate scams described in this proceeding are at least $2,663,515.  *See Freecom Communs., Inc.*, 401 F.3d at 1206 (gross revenues used to calculate monetary relief).  Of this amount, $889,794 is attributable

50

to the credit repair and loan modification scams, and $1,773,721 is attributable to the fraud involving undistributed mortgage monies.[161]  S. Lalonde is jointly and severally liable for the full $2,663,515 and Petroski is liable for $533,165  – the monies earned by Crossland and Scoreleaper during the ten months he was manager ($507,165),[162] plus additional monies he received independently from consumers through Western Union ($26,000).[163]   The monetary provisions applicable to Lalonde contains an offset for any restitution payments made by S. Lalonde pursuant to his criminal conviction.[164]

## III.    CONCLUSION

Based on the reasons set forth herein, the Court grants in part and denies in part the Plaintiff's Motion for Summary Judgment against Defendants, Stephen Lalonde, Amy Lalonde and Michael Petroski (DE# 113-1, 8/26/10).  The FTC is entitled to entry of a final judgment, including a permanent injunction and an award of monetary relief against the defendants, Stephen Lalonde and Michael Petroski.  The FTC is not entitled to summary judgment against

---

[161]   As discussed in Sections II.B and C, the damage figures are conservative.  The figure for Spectrum ($1,773,721) represents undistributed monies from consumers' refinancing agreements; total undistributed monies, including monies from *any* mortgage agreement, were $2,181,486.  The figures for the loan modification and credit repair scams assume that the scams originated with the startup of Crossland in June 2008; testimony from a 1st Guaranty manager indicates that the scams may actually have been operational in 2007.  Further, the figures omit millions of dollars in revenues reported on financial statements of Lalonde companies, which, although not named as Defendants, made or received hundreds of thousands of dollars in cash from the corporate Defendants without any explanatory paperwork.

[162]   The calculation is based on earnings of Crossland, Scoreleaper, and 1st Guaranty times the number of months that Petroski was the manager ($889,794 x 10/17.5).

[163]   SOUF, ¶ 114.

[164]   The final judgment will require that Defendants' assets be turned over to the FTC.  In the case of S. Lalonde, the turnover provision includes assets of related non-party entities in which he was the sole principal and owner (SOUF, ¶ 34).  The assets of these entities are in effect his assets.

Amy Lalonde and thus, the motion for summary judgment is denied as to her.

DONE AND ORDERED in Miami, Florida, this **30th** day of March, 2011.

_____
JOHN O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided to:
All Counsel of Record

Copies provided by Chambers to:

Amy Lalonde
2090 NE 65th Street
Fort Lauderdale, FL 33308

Stephen Lalonde
Reg. No. #91119-004
Adams County Correctional Center
P.O. Box 1600
Washington, MS 30190

Michael Petroski
5161 NE 18th Ave
Fort Lauderdale, FL 33334

Michael Petroski
P.O. Box 407016
Fort Lauderdale, FL 33340

Michael Petroski
Reg. No. 151000125-8B
Joseph V. Conte Facility
P.O. Box 407016
Ft. Lauderdale, FL 33340